**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0774n.06
Filed: December 19, 2008

No. 07-5312

**United States Court of Appeals**
**for the sixth circuit**

| | | |
|---|---|---|
| VERNON G. SMITH, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Kentucky. |
| CATERPILLAR, INC.; RON | * | |
| GRIFFIN; ALAN SHEPHERD; | * | |
| KEN HARTWIG, | * | |
| | * | |
| Defendants - Appellees. | * | |


Before KEITH, GRIFFIN, and JOHN R. GIBSON,[*] Circuit Judges.


JOHN R. GIBSON, Circuit Judge.

Vernon Greg Smith appeals from the district court's grant of summary judgment against him and in favor of Caterpillar, Inc. Smith contends that he was wrongfully discharged from an implied employment contract with Caterpillar after he threatened to report potential safety issues to the Federal Occupational Safety and Health Administration. He further alleges that Caterpillar breached his implied employment contract and that Caterpillar and its employees tortiously interfered with his employment. Finally, he asserts that the district court erred in denying his motion to amend his complaint and that the district court judge was biased against him. We affirm.

I.

---

[*]The Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

Smith was employed as a maintenance technician at the Danville branch of Caterpillar, Inc. from March 22, 1999 until September 19, 2000. Caterpillar's plant uses a "heat treat line" to harden metallic parts. A fault card in the computer monitors the heat treat line. If it senses a mechanical problem, it automatically stops the line. In early 2000, Smith claimed that a short in the wire connecting the heat line to the computer caused the heat line to repeatedly stop when no fault actually existed. Smith's supervisor Douglas and another maintenance technician worked on the problem, but they resolved the problem by disconnecting the fault card and not solving the underlying issue.

Smith approached Douglas with technical diagrams showing that the heat treat line was a safety hazard, but Douglas stated that he had investigated the issue and disagreed with Smith's assessment. Smith spoke to Greg Rziplinksi, Douglas's supervisor, about the issue but came away equally dissatisfied. Several weeks later, Smith told his fellow employee Jeff Lamb that if Caterpillar did not fix the problem, he would call OSHA about repairing it. The day after, Smith met with Ron Griffith, the plant manager, who told him that he did not believe the disconnected card was a problem. Nevertheless, Griffith sought the advice of an electrical engineer, Aaron Kinney, who, after reviewing the wiring diagrams, thought that the fault card could be a problem. Griffith directed maintenance to address the issue in a way that kept the fault card connected to the heat treat line.

Smith alleges that around this time, he began receiving negative performance reviews from Douglas and that Allen Shepherd, the operations manager, began to inquire about his job performance. On September 15, 2000, Shepherd conducted a "turnover meeting," which is held at the end of each shift to allow the outgoing technicians to inform the incoming technician about the status of repairs and further work that needs to be done in the following shift. During the meeting,

Shepherd asked Smith what machines he had serviced that evening, to which Smith named some of the machines but then paused, prompting Shepherd to ask what other machines he had worked on. Smith replied that he had worked on an accumulator. Shepherd asked which one and, in frustration, cursed at Smith. Shepherd informed Smith that he was disappointed with his lack of preparation for the turnover meeting.

After the meeting, Smith told Shepherd that he had no right to talk to him the way he did, to which Shepherd reiterated his expectation that Smith should know which machines he repaired during his shift. Shepherd asked Smith if he understood these expectations, and Smith did not respond. Shepherd told Smith that he would be fired immediately if he did not respond. Smith replied that he could fire him if he so desired. Shepherd did not fire him but reported the incident to Ken Hartwig, Danville plant's human resources manager at the time.

The next day, Hartwig prepared a written warning documenting the incident and asked Lamb to bring Smith to his office. Smith claims that Lamb told him that he would be fired if he did not quit. Smith met with Hartwig and Lamb in Hartwig's office. Hartwig told Smith that he needed to sign the document, indicating that he had received a written warning. Smith refused, and contends that Hartwig told him that he would be fired if he did not sign the warning. Smith refused to sign the warning. Hartwig claims that Smith quit; Smith maintains that he was fired. Smith signed an agreement to return any Caterpillar property within his possession and left the building.

II.

We review de novo a district court's grant of summary judgment. *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 627 (6th Cir. 2008). Summary judgment is properly granted

where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id*.

## A. Wrongful Termination.

Under Kentucky law, an employment relationship is generally terminable at will. *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). This means that "[a]n employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Id*. However, an employee can state a claim for wrongful discharge if his termination "is contrary to a fundamental and well-defined public policy as evidenced by existing law . . . ." *Id*. (quoting *Brockmeyer v. Dun & Bradstreet*, 335 N.W.2d 834, 835 (Wis. 1983)).

Smith contends that he was wrongfully discharged because Caterpillar fired him for threatening to call OSHA. Smith failed to specify which well-defined public policy his purported discharge would violate, although during his deposition, he specified the federal OSHA statute. As the district court recognized, both the federal OSHA statute, 29 U.S.C. § 660(c), and the Kentucky OSHA statute, Ky. Rev. Stat. Ann. § 338.121(3), specify that public policy forbids firing in retaliation for complaints filed under their respective OSHA statutes:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1); Ky. Rev. Stat. Ann. § 338.121(3).

But under Kentucky law, the public policy rule applies only when the statute creating the public policy does not provide a structure for pursuing a complaint under the statute. *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Here, both the federal OSHA statute, at 29 U.S.C.

- 4 -

§ 660(c)(2), and the Kentucky OSHA statute, at Ky. Rev. Stat. Ann. § 338.121(3)(b), outline a procedure whereby a complaint shall be filed with the Secretary of Labor or the Executive Director of the Office of Occupational Safety and Health. "Where the statute both declares the unlawful act and specifies the civil remedy available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Grzyb*, 700 S.W.2d at 401. Therefore, Smith can state no separate claim for wrongful discharge. *Hines v. Elf Atochem N. Am., Inc.*, 813 F. Supp. 550, 552 (W.D. Ky. 1993) (holding that both federal and Kentucky OSHA statutes preempt wrongful discharge claims based on OSHA).

### B. Breach of Implied Contract.

Smith contends that Caterpillar breached an implied employment contract when it discharged him from his employment. While employment for an indefinite period of time may be terminated by either party at will, parties can modify the at-will relationship by entering into an employment contract that is terminable only pursuant to express terms of the contract. *See Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 491-93 (Ky. 1983). Here, nothing altered Smith's at-will employment status. Indeed, he admitted as much in the third paragraph of his complaint. ("My employment was [] terminable at will either by the employer or the employee."). He reiterated this view during his deposition, though he "reserve[d] the right to add something to it later" because he may not have understood "what's going on."

Smith nevertheless argues that he had an implied employment contract because he thought that (1) Caterpillar was a good company, (2) Caterpillar was a wealthy company, and (3) he was a good worker. None of these reasons can transform his at-will employment status into an implied contract. There being no contract, his breach of contract claim necessarily fails.

C. Tortious Interference.

Smith contends that Caterpillar tortiously interfered with his employment. Under Kentucky law, tortious interference with employment requires a showing of the following elements: (1) the existence of a contract; (2) defendant's knowledge of the contract; (3) defendant's intent to cause breach; and (4) defendant's conduct that caused the breach. *Lovely v. Aubrey*, 188 F.3d 508, 1999 WL 701921 at *4 (6th Cir. 1999) (unpublished) (citing *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995)). Even if we assume that there was a contract between Smith and Caterpillar, Caterpillar, as a party to an agreement, cannot tortiously interfere with the performance of its own contract. *Rawlings v. Breit*, 2005 WL 1415356, at *3 (Ky. Ct. App. Jun. 17, 2005) (unpublished). Moreover, Shepherd, Griffith, and Hartwig were acting on Caterpillar's behalf, not in their own interests. Smith did not point to any admissible evidence that would support a claim that the individual defendants were acting on their own behalf. Therefore, the individual defendants are similarly absolved from this claim. *Id*.

D. Denial of Motion to Amend Complaint.

We review for abuse of discretion a district court's denial of a motion to amend the pleadings on the ground that the motion was untimely and prejudicial. *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

The Federal Rule in effect when the motion was decided provided that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Nevertheless, to take advantage of the Rule's liberality, the party requesting leave "must act with due diligence." *Parry*, 236 F.3d at 306 (quoting *United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1202 (6th Cir. 1995)). Factors that may be considered in deciding whether to permit an amendment include undue delay

in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendments. *Coe v. Bell*, 161 F.3d 320, 341-42 (6th Cir. 1998).

Here, all motions to amend the parties' pleadings were due no later than April 28, 2006. After the defendants filed their motion for summary judgment, Smith filed his second motion to amend on November 28, 2006, alleging claims for tortious interference of a prospective advantage and tortious interference with employment. The district court properly deemed that seven months' delay between the last date for amendment in the scheduling order and the motion for leave to amend, coupled with the prejudice to the defendants of reopening a case that was "essentially closed," justified denial of Smith's motion to amend. *See Coe*, 161 F.3d at 341-43 (considering filing motion to amend seven months after last date for amendment "substantial" and combined with prejudice to the opposing party of filing new answers and motions—in essence re-opening the case—justified denial of motion to amend). Moreover, the district court had already granted him one motion to amend. There was no abuse of discretion by the district court.

## E. Judicial Bias and Other Claims.

Smith claims that District Judge Coffman was biased against him because she was appointed by President Clinton with the help of Terry McBrayer, a man who Smith claims to have sued and who, as a result, harbors animus against him. *See* 28 U.S.C. §§ 144 and 455(a). However, recusal is necessary only where a "reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality." *See Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990). This is an objective standard and it is not based "on the subjective view of a party."

*Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988). Here, Smith's subjective speculation alone is insufficient to form the basis of a judicial bias claim. *See Hughes*, 899 F.2d at 1501.

On appeal, Smith raises other issues such as the constitutionality of the time limitations for bringing a lawsuit, his grandfather's previous lawsuit, and the immorality of big corporations like Caterpillar. These claims are either irrelevant or lack factual or legal basis.

III.

Accordingly, we AFFIRM the district court's grant of summary judgment on all claims.