*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0211p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

EVERETT SROUDER,

*Plaintiff,*

MATT WHITE,

No. 12-5835

*Plaintiff-Appellant,*

*v.*

DANA LIGHT AXLE MANUFACTURING, LLC,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:10-cv-00155—William O. Bertelsman, District Judge.

Decided and Filed:  August 7, 2013

Before:  BATCHELDER, Chief Judge; SUHRHEINRICH and SUTTON, Circuit
Judges.

_____

## COUNSEL

**ON BRIEF:** James Y. Moore, ERIC C. DETERS & PARTNERS, PSC, Cincinnati,
Ohio, for Appellant.  Marjorie A. Farris, Shannon Antle Hamilton, Karen M. Paulin,
STITES & HARBISON, PLLC, Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

ALICE M. BATCHELDER, Chief Judge.  Matt White appeals from the district
court's order granting summary judgment to White's former employer, Dana Light Axle
Manufacturing, LLC ("Dana").[1]  During his employment with Dana, White had

---

[1]This case originated with two plaintiffs, Everett Srouder and Matt White, each of whom brought
FMLA retaliation and interference claims against Dana.  After Dana moved for summary judgment against
each plaintiff, the plaintiffs abandoned their retaliation claims and argued only their interference claims.
The district court denied summary judgment to Dana on Srouder's claims, and Srouder eventually settled

problems with his attendance and with obtaining proper medical certifications for various absences he claimed were protected under the Family Medical Leave Act ("FMLA"). Eventually, White developed a hernia that required surgery. Dana terminated White's employment for his failure to follow the call-in requirements of Dana's attendance policy. White sued Dana, alleging interference with his rights under the FMLA. Because the applicable regulation under the FMLA expressly permits an employer to enforce its "usual and customary notice and procedural requirements for requesting leave," 29 C.F.R. § 825.302(d), we AFFIRM the district court's grant of summary judgment for Dana.

## I.

Matt White began working as an assembly worker for Dana Light Axle Manufacturing, LLC ("Dana") in September 2006, at Dana's Dry Ridge, Kentucky plant. Initially, White worked second shift, from 2:00 p.m. to 10:15 p.m.; then, approximately one year before his termination, he was moved to first shift, from 6:00 a.m. to 2:15 p.m. White's job required him to be lifting various parts weighing on average between twenty and seventy-five pounds for at least half the time he was on shift. Apparently, White was noted as being a good worker when present, but as having consistent attendance problems. Between January 26, 2009, and September 24, 2009, White called in approximately nineteen absences for various reasons, including emergency vacation leave, vacation leave, unpaid leave, and FMLA leave. White took FMLA leave more than once during 2009 due to gout and perhaps other unrelated back and foot pain as well.

In September 2009, White began suffering complications related to multiple abdominal surgeries stemming from a car accident in 1995. White had punctured his intestines in the accident and had undergone surgery to remove three feet of his intestines. He subsequently suffered hernias that required additional surgeries. Before his hernia problem resurfaced in September 2009, White had last undergone hernia

with Dana. However, the district court granted Dana's motion for summary judgment against White. Accordingly, White is the only plaintiff involved in this appeal.

surgery in 1999. White began seeking medical attention for his stomach pain in September 2009. On September 22, 23, and 24, he called in to take FMLA leave. Apparently, on September 25, White's surgeon scheduled him to have surgery on October 7.

Also on September 25, White went into work, but was sent home after submitting an incomplete medical certification for previously claimed FMLA absences. According to the affidavit of Brandy Race, the Human Resources Manager at Dana's Dry Ridge plant, Race had requested medical certification from White for his claimed FMLA absences taken in late August and on September 1. When White submitted incomplete paperwork on September 16, Race notified White of the deficiencies, giving him until September 23 to submit the completed certification. On September 21, Race met with White, along with Wade Wilmer, the Production Manager at the time, to discuss White's need to submit proper medical certification for his claimed FMLA absences in late August. As previously noted, White was absent from work on September 22, 23, and 24, again claiming FMLA leave, and he did not re-submit the required certification until September 25. His certification still being incomplete, White was sent home and told to return at 9:00 a.m. on Monday, September 28, for a meeting with Race. White failed to come to the 9:00 a.m. meeting, but he did appear some time during that day. Race rescheduled the meeting with White for 9:00 a.m. on September 30.

The parties dispute exactly what happened during the September 30 meeting. Race's notes reflect that White, Race, Wilmer, and Brian Peeno, the first shift Union Steward, were present at the meeting. White testified that Ben Smith, his supervisor, was also present. In her affidavit, Race stated that she had prepared a termination letter for White before the meeting, but decided not to terminate White upon hearing his explanation that he was unable to submit his certification on the 23rd because he had been sick. Race acknowledged that White submitted a new medical certification dated September 28, relating to White's September 22, 23, and 24 absences, as well as a doctor's note restricting White from lifting anything over twenty pounds. Race maintained that White never used the word "hernia" during the September 30 meeting.

According to Race, White stated that he had a "hole in his stomach" and might be having surgery soon. Race's notes from the meeting generally support this account in her affidavit.[2]

However, White testified in his deposition, "I told them I was having surgery the following week, and Friday, October 2nd, I was—I had to go to my anesthesiologist to get prepped for surgery." Maintaining that he discussed his upcoming surgery at the September 30 meeting, White stated, "I explained to them about how Dr. Ashcraft told me how my hernia was—could get twisted and it was dangerous to be at work. He explained it like someone with their hands around your neck because how the hernia was coming through the incision and it could get twisted and it was very—it was dangerous." When asked whether he specifically used the word "hernia," White replied, "Yes." Furthermore, the medical certification form that White submitted at the September 30 meeting noted that White's condition "may be hernia," that White was suffering abdominal pain, and that White had been referred to—and had an appointment with—a surgeon "for evaluation of possible hernia."

According to Race's notes, she informed White during the meeting that given his weight-lifting restriction, Dana could not place him on assignment in the plant. White then responded that he could get his doctor's authorization to return to work and be back to work the next day. Race's affidavit states that at the conclusion of the meeting, she understood that White was going to his doctor to get his weight-lifting restriction removed, and that he would be back at work the next day.

White testified that at the September 30 meeting, "they said my paperwork was fine and that there was no light duty and that I could not return to work." White maintained that he told them he would try to get his restriction lifted. In White's mind,

---

[2]At one point, Race's notes reflect that White said "that he was going *to have to* have surgery soon." Race's notes later reflect that towards the end of the meeting, White "said that he *may have to* have surgery."

Moreover, Race's notes were also signed by Wilmer, who gave an affidavit stating:
During the September 30, 2009 meeting, Mr. White stated that he had been sick, that he had a hole in his stomach, and that he might need to have surgery. Mr. White did not tell us that he had a hernia, that he was already scheduled to have surgery, or that he would be off of work for six to eight weeks.

he was doing this "so I could work those couple days before my surgery." According to White, he called back later that afternoon and talked to Karen Van Holten in Human Resources, informing her that he could not in fact get his doctor to remove his weight-lifting restriction. Van Holten, in turn, did not remember such a phone call. White testified that Van Holten told him to fill out short-term disability paperwork, and Van Holten did affirm that "[a]t some point in late September 2009," she provided a short-term disability application form to White upon his request.[3] White further stated that during the September 30 meeting, "[t]hey told me there was no light duty at the time, that I would not be able to work." He also said, "you know, like [Race] told me, 'There's no light duty. You can't come back to work until your doctor releases you.'"

It is undisputed that White did not come to work on October 1, 2, 5, or 6. Furthermore, it is also undisputed that White failed to "call in" pursuant to Dana's attendance policy. This policy was a "no-fault" plan, under which Dana expected perfect attendance. Under the policy, each employee was responsible to personally call in his own absences. Moreover, the policy expressly provided, "All absences must be phoned into [the number provided] on a daily basis. Calls to other numbers will not be acceptable." Employees were clearly instructed, "Your [sic] must call in each and everyday [sic] of an absence before the start of your shift." Importantly, the policy explicitly stated, "If an individual fails to report to work for two days and has not called in, that person is considered to have voluntarily quit." Dana's FMLA policy required an employee to provide both advance leave notice and medical certification. If the leave was foreseeable, the policy required thirty days' notice. If the leave was not foreseeable, the policy required "as much notice as possible." The policy also stated, "Dana requires medical certification to support a request for leave because of a serious health condition . . . ." According to the FMLA Policy, Dana could deny or delay an employee's taking of leave if the policy's requirements were not met.

---

[3]Race's notes from the September 30 meeting reflect that towards the end of the meeting that morning, White "stated that he received Short Term Disability paperwork from Karen [Van Holten] and that he was going to complete it and get it back to us tomorrow."

On October 1, Race sent White a memorandum notifying him of various deficiencies in the medical certification he had submitted during the September 30 meeting for his absences on September 22, 23, and 24, and giving him until October 7 to submit proper certification. However, because White failed to come to work and did not call in his absences for several days, Race sent White a termination letter dated October 6, 2009. The letter noted White's absences and accompanying failure to notify his supervisor, and then stated, "[O]ur records will indicate you are voluntarily resigning from your role at Dana." The letter proceeded to inform White, "In the event there are any extenuating circumstances that we should consider, please contact your supervisor immediately. Otherwise, we will process your termination effective Tuesday, October 6, 2009."

On October 7, before White had received the termination letter, he took his certification paperwork back to the doctor (i.e., the doctor who had referred him to the surgeon, not the surgeon who performed his hernia surgery); the doctor (or someone in his office) filled in some additional material on the form; and White dropped off the revised certification form on Race's desk before he went in for his surgery on that same day. White received the termination letter the following day, October 8. Apparently, White started calling in absent on October 9, alleging FMLA leave, and continued doing so through October 15. He testified that Brian Peeno (the first shift Union Steward) advised him to do this when he called Peeno upon receiving the termination letter. Some time on or after October 9, Race received a completed short-term disability application from White and his surgeon. The application contained information concerning White's surgery on October 7, and also indicated that White's recovery period would be approximately six weeks from the date of surgery.

At his deposition, White testified regarding his understanding of the "call-in line" for Dana employees. According to White, the line was not to a person, but to a computer, and the employee simply left his name, clock number, and sometimes an explanation for why he was taking the day off. White opined that he thought the supervisors were the ones who got the messages from the call-in line. When asked

whether an employee could call in one morning and "talk to a supervisor to tell him you weren't coming in," White responded, "I'm not sure if you could or not.  You just go by the emergency—you know, the call-in line.  You would always just call that in to make sure."  The attorney at the deposition immediately followed up with, "That was the procedure, you called the call-in line?"  White replied, "Right."  Shortly thereafter, the attorney asked White, "Were there ever times when you were going to be absent but you did not need to call in to the call-in line?"  White responded, "No—I mean, if you were going to be absent, you had to call in, yeah."

Later in his deposition, however, White maintained that after the September 30 meeting, he thought that he did not need to call in his absences because of what Race had told him during that meeting and because he had said he was having surgery.  According to White, Dana personnel knew that White was not coming into work because they had told him there was no light duty work for him to do, and because they knew he was having surgery.  Thus, White affirmed that he was under the impression he did not need to call in his absences following the September 30 meeting.

White now appeals the district court's grant of summary judgment to Dana on White's FMLA interference claim.

**II.**

"We review the district court's order granting summary judgment *de novo*." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 417 (6th Cir. 2004).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether this standard is met, "[w]e must accept the non-moving party's evidence, and draw all justifiable inferences in his favor." *Brenneman*, 366 F.3d at 417 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A plaintiff bringing an interference claim under the FMLA has the burden to prove that:

> (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled.

*Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). The issue in this case arises under the fourth element. Specifically, the question confronting us is whether an employer may impose and enforce its own internal notice requirements, even if those requirements go beyond the bare minimum that would generally be sufficient under the FMLA to constitute proper notice.

This Court previously addressed this question in *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713 (6th Cir. 2003). In *Cavin*, the employer (Honda) required its employees to notify the leave coordination department for absences continuing for more than one day. *Id.* at 716. If the need for leave was unforeseeable, the employee was required to request leave within three days. *Id.* If an employee was absent for three consecutive workdays and failed to notify the leave coordination department, that employee would be separated from employment. *Id.*

This Court held that "the FMLA does not permit an employer to limit his employee's FMLA rights by denying them whenever an employee fails to comply with internal procedural requirements that are more strict than those contemplated by the FMLA." *Id.* at 720. The rationale for this holding was the then-current text of the regulation for foreseeable FMLA leave.[4] At that time, 29 C.F.R. § 825.302(d) provided:

> An employer may . . . require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave. . . . However, failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice.

---

[4] Acknowledging that "Cavin's need for leave was not foreseeable," 346 F.3d at 721—Cavin was in a motorcycle accident—the Court held that "the discussion in [29 C.F.R.] § 825.302 about employer notice procedures in the context of an employee's foreseeable need for leave should also apply in the context of an employee's unforeseeable need for leave," *id.* at 722.

The *Cavin* panel reasoned that "[i]n permitting employers to develop notice procedures, the Department of Labor did not intend to allow employers in effect to undermine the minimum labor standard for leave." 346 F.3d at 722. The Court concluded "that employers cannot deny FMLA relief for failure to comply with their internal notice requirements. Therefore, . . . Honda could not interfere with Cavin's FMLA rights by enforcing its notice requirements to deny Cavin benefits to which he otherwise may have been entitled under the FMLA." *Id.* at 723.

However, the regulatory language underlying this holding in *Cavin* is no longer in effect. In fact, the language of § 825.302(d) was *materially* altered in the revisions to the FMLA regulations effective January 16, 2009. That subsection now provides, in part:

> An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances. . . . An employee . . . may be required by an employer's policy to contact a specific individual. Unusual circumstances would include situations such as when an employee is unable to comply with the employer's policy that requests for leave should be made by contacting a specific number because on the day the employee needs to provide notice of his or her need for FMLA leave there is no one to answer the call-in number and the voice mail box is full. *Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied. . . .*

29 C.F.R. § 825.302(d) (emphasis added). This language explicitly permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances.[5] Thus, to the

---

[5]Moreover, 29 C.F.R. § 825.304(e) provides:
An employer may waive employees' FMLA notice obligations or the employer's own internal rules on leave notice requirements. If an employer does not waive the employee's obligations under its internal leave rules, the employer may take appropriate action under its internal rules and procedures for failure to follow its usual and customary notification rules, absent unusual circumstances, as long as the actions are taken in a manner that does not discriminate against employees taking FMLA leave and the rules are not inconsistent with § 825.303(a).

extent *Cavin* held to the contrary, its holding has been effectively abrogated by the subsequent revisions to § 825.302(d).[6]

It is true that *Cavin* based its rationale not only on the language of § 825.302(d), but also on the general purpose and policy underlying the FMLA. *See* 346 F.3d at 720–23. However, to enforce *Cavin*'s holding in the face of the express, plain language of the revised regulation would be to ignore the revision's plain language designed to address the giving of notice for foreseeable leave.

Thus, in light of the revisions to § 825.302(d), we hold that an employer may enforce its usual and customary notice and procedural requirements against an employee claiming FMLA-protected leave, unless unusual circumstances justify the employee's failure to comply with the employer's requirements. Here, White has produced no evidence demonstrating the type of "unusual circumstances" that would have justified his failure to follow the call-in requirements of Dana's attendance policy.[7] Furthermore, despite White's personal impression, there is no evidence that Dana waived its call-in requirements for White during his October absences. Therefore, we hold that regardless of whether White provided sufficient FMLA notice to Dana during the September 30 meeting, Dana was nevertheless justified in terminating White's employment for his failure to follow the call-in requirements of Dana's attendance policy.

---

[6]Interestingly, an official report from 2007 addressing the FMLA regulations, in a section discussing the former version of § 825.302(d) relied upon in *Cavin*, noted:

> This issue of an employer's ability to enforce its own notice policies for employees taking leave has been litigated in the federal courts with varying results. Two appellate courts have addressed whether the application of employer policies requiring employees to notify a specific individual or office when requesting a leave of absence violates the FMLA and have reached differing results.

Family and Medical Leave Act Regulations: A Report on the Department of Labor's Request for Information, 72 Fed. Reg. 35550 (June 28, 2007) (footnote omitted). The report then discussed *Cavin* and a Tenth Circuit case, *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 (10th Cir. 2004).

[7]Although White was suffering from a hernia and it is not clear exactly what his condition was on October 1, 2, 5, or 6, White testified that on October 7, the day of his surgery, he was able to go into his doctor's office with FMLA paperwork and then drop off that paperwork on Race's desk before his surgery that afternoon. Thus, we do not believe that there is any reason to conclude White was unable to make any phone calls from October 1–6, and, indeed, White has made no such claim. Accordingly, White has not provided evidence showing unusual circumstances in this case.

**III.**

For the foregoing reasons, we **AFFIRM** the district court's order granting summary judgment to Dana.